# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| ROXANNE TYLER, as Trustee for the Next of Kin of Thomas Tyler, | Civil No. 08-617 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| CHARLES M. HARPER, JR., M.D., and MAYO CLINIC-ROCHESTER, a Minnesota corporation, | |
| Defendants. | |

---

David B. Ketroser, **DAVID B. KETROSER, M.D., J.D.**, P.O. Box 427, Hopkins, MN 55343, for plaintiff.

Gregory E. Karpenko and Thomas S. Fraser, **FREDRIKSON & BYRON, P.A.**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425; and Matthew J. Hanzel, **MAYO CLINIC LEGAL DEPARTMENT**, 200 First Street SW, Rochester, MN 55905, for defendants.

On March 4, 2008, plaintiff Roxanne Tyler ("plaintiff"), as trustee for the next of kin of Thomas Tyler ("Tyler"), brought this action against defendants Dr. Charles M. Harper, Jr. and Mayo Clinic-Rochester ("Mayo") (collectively, "defendants"), alleging that defendants negligently failed to diagnose Tyler's kidney cancer in 1999. Defendants filed a motion for summary judgment, arguing that plaintiff's expert evidence on causation is inadequate and that Minnesota's four-year statute of limitations bars the action. Plaintiff filed a motion for partial summary judgment on the issue of defendants' negligence. For the reasons set forth below, the Court denies the motions.

# BACKGROUND

## I.    TYLER'S DIAGNOSIS WITH RENAL CELL CARCINOMA

In 1989, Tyler was diagnosed with myasthenia gravis, an autoimmune disease that affects the body's neuromuscular system.  (Harper Decl. ¶¶ 2-3, Docket No. 19.) Dr. Harper began treating Tyler for that condition.  (*Id.*)  Tyler's myasthenia gravis eventually led to the development of a tumor in his thymus gland called a thymoma.  (*Id.* ¶ 3.)  Mayo removed the thymoma, and on September 19, 1999, Mayo took a CT scan of Tyler's chest (the "1999 CT scan"), which confirmed that the thymoma had not recurred. (*Id.* ¶ 4.)  The radiologist reviewing the 1999 CT scan noted, however, that "[t]here is a large inhomogeneous mass arising from the lower pole of the left kidney. . . . This mass is indeterminate and is worrisome for renal cell carcinoma."  (Ketroser Decl. Ex. 1, Docket No. 27.)  Defendants admit that they "did not perform testing on Tyler's left kidney between September 22, 1999, and November 4, 2005."  (Joint Answer ¶ 5, Docket No. 5.)

Mayo provided care to Tyler on a number of occasions between September 1999 and November 2005, including follow-up visits and consultations with Tyler about management of Tyler's medications.  (Ketroser Decl. Ex. 7, Grammens Am. Aff. ¶¶ 11-12, Docket No. 29.)  In particular, a July 18, 2005, x-ray of Tyler's chest was normal. (Ketroser Decl. Ex. 1, Docket No. 27; *see also* Ketroser Decl. Ex. 1, Grammens Aff. ¶ 11, Docket No. 29.)  On November 4, 2005, Tyler underwent another chest CT scan at Mayo (the "2005 CT scan").  (Compl. ¶ 7, Docket No. 1.)  The 2005 CT revealed that the

mass in Tyler's left kidney had increased in size since September 1999 and showed masses in Tyler's lungs.  (*Id.*)  Testing confirmed that the mass in Tyler's kidney was cancerous – renal cell carcinoma – and had metastasized to the lungs.  (*Id.* ¶ 8.)  Testing also revealed that the kidney mass was a maximum of 8.5 centimeters in diameter, and that the cancer had reached Stage IV.  (*Id.*)  In notes taken after the November 4, 2005, visit, Dr. Harper explained that the kidney mass identified by the radiologist after the 1999 CT scan previously "went unnoticed" by him and that he had "made no mention of the renal cell mass present in the radiology report" after the 1999 CT scan.  (Ketroser Decl. Ex. 2 at 1-2, Docket No. 27.)

On November 10, 2005, Dr. Michael Blute, a Mayo urological surgeon, surgically removed part of Tyler's kidney in a procedure referred to as a nephrectomy.  (Karpenko Decl. Ex. C at 2, Docket No. 21.)  Despite undergoing the nephrectomy, Tyler died on October 27, 2007, after metastases continued to develop in his brain and lungs.  (Compl. ¶ 9, Docket No. 1.)

On March 4, 2008, Tyler's wife, as trustee of Tyler's next of kin, brought this medical malpractice action, alleging that defendants breached a standard of care owed to Tyler by failing to evaluate, prior to 2004, the renal mass that the radiologist identified after the 1999 CT scan.  (*Id.* ¶ 12.)  Plaintiff alleges that the failure to diagnose and treat the kidney mass "allowed the cancer to advance to an incurable status."  (*Id.*)  Defendants admit that they did not perform additional testing on the renal mass identified in the 1999

CT scan and that such failure breached a standard of care owed to Tyler. (*See* Joint Answer ¶ 10, Docket No. 5.)

On April 16, 2009, defendants filed a motion for summary judgment arguing (1) that plaintiff failed to produce expert testimony sufficient to establish causation; and (2) that Minnesota's four-year statute of limitations bars this action. Plaintiff filed a motion for partial summary judgment on the issue of defendants' negligence.

## II.    EXPERT OPINIONS

The parties agree that physicians determine a patient's cancer survival prognosis by staging the cancer. (*See, e.g.*, Karpenko Decl. Ex. B, Grammens Dep. Tr. at 83:6-9, Docket No. 21.) The parties also agree that, in these circumstances, determining Tyler's survival prognosis requires the parties to adduce expert opinions regarding the stage of Tyler's cancer in 1999. As explained by defendants:

> [D]octors stage [renal cell] cancer based on various factors, including the size of the tumor, whether and to where it has spread, and other features of the disease, such as renal sinus fat invasion, tumor necrosis, and tumor grade. "Renal sinus fat invasion" refers to the spread of the kidney cancer into the sinus fat adjacent to the kidney. "Tumor necrosis" refers to dead cells or tissue death within the tumor. Tumor "grade" refers to the malignancy level of the cancer cells.

(Defs.' Mem. in Supp. of Mot. for Summ. J. at 3, Docket No. 18.)

### A.    Plaintiff's Expert: Dr. Gary Grammens

Plaintiff retained Dr. Gary Grammens as an expert. Dr. Grammens is a consulting physician in the fields of hematology and oncology. (Ketroser Decl. Ex. 1, Grammens

Aff. ¶ 4, Docket No. 29.)   Although he is not qualified to perform nephrectomies, Dr. Grammens asserts that he is "qualified through both training and experience to determine which patients would probably benefit from nephrectomy for treatment of their renal carcinoma." (Ketroser Decl. Ex. 7, Grammens Am. Aff. ¶ 4, Docket No. 29.)

On September 6, 2008, Dr. Grammens submitted an expert affidavit.  In that affidavit, Dr. Grammens stated that in September 1999, Tyler's "left renal mass was probably a T1 or T2 tumor[1] . . . and there is no evidence that the tumor extended beyond the kidney or had metastasized.  Therefore, Mr. Tyler's renal carcinoma was probably at Stage I or, less likely, Stage II."  (Ketroser Decl. Ex. 1, Grammens Aff. ¶ 17, Docket No. 29.)  Further, Dr. Grammens opined that "[t]he standard of care probably required the same treatment for Mr. Tyler's renal carcinoma from 1999 through at least March 2004 because there was no evidence that Mr. Tyler's renal carcinoma extended beyond the kidney or had metastasized up to and probably beyond that time."  (*Id.* ¶ 19.)  Dr. Grammens concluded that if Tyler had undergone a nephrectomy for his Stage I or Stage II renal carcinoma between September 1999 and March 2004, "it is probable that he would have been cured of his renal carcinoma because the statistics for treatment for that stage of renal carcinoma indicate significantly more that half the patients are cured with that treatment alone."  (*Id.* ¶ 20.)

---

[1] In his amended expert affidavit, Dr. Grammens stated that the renal mass was probably a "T1b or T2 tumor."  (Ketroser Decl. Ex. 7, Grammens Am. Aff. ¶ 4, Docket No. 29.)  A T1b tumor is more than 4 centimeters but not more than 7 centimeters in its greatest dimension, and is limited to the kidney.  A T2 tumor is more than 7 centimeters in its greatest dimension, and is limited to the kidney.  (*Id.* Ex. 2.)

On February 25, 2009, defendants deposed Dr. Grammens. Dr. Grammens testified that he employed the TNM staging system when staging Tyler's kidney cancer in September 1999 and in November 2005. (Karpenko Decl. Ex. B, Grammens Dep. Tr. at 32:3-24, Docket No. 21.) The TNM staging system evaluates the size of a malignant tumor ("T"), whether there is evidence the cancer has spread to lymph nodes ("N"), and whether there is evidence of metastatic disease ("M"). (*Id.*)

After defendants' counsel asked if Dr. Grammens conducted "any staging analysis of the kidney cancer that . . . . Tyler had in 1999," Dr. Grammens testified: "It was impossible to do any accurate staging. I didn't have access to accurate measurements of his tumor size, and there was no evaluation of specifically his kidney cancer." (*Id.* at 42:23 - 43:5.) Dr. Grammens testified that he had not reviewed any images from the 1999 CT scan when he signed the original expert affidavit. (*Id.* at 69:7-18.) Dr. Grammens testified that his original expert affidavit opinion, which asserted that Tyler's cancer was a "T1 or T2 tumor" in 1999, was based on the conclusion that the 1999 tumor would have been considerably smaller than the tumor as removed in 2005. (*Id.* at 76:21 - 77:23.) Specifically, Dr. Grammens testified that "it would be reasonable to assume that [the tumor] was probably half the size" in 1999 of the size of the tumor in 2005.[2] (*Id.* at 78:23 - 79:4.) Dr. Grammens further testified that at the time he submitted

---

[2] The relevant portion of the deposition testimony is excerpted here:

Q.    What is your reasonable assumption as to what the size of the tumor was
       in Mr. Tyler in 1999?

(Footnote continued on next page.)

the original affidavit, "there was no information available" to him suggesting that the tumor had invaded the renal fat or perirenal sinus, and that he did not have additional information regarding the location of Tyler's tumor because "it was incompletely visualized." (*Id.* at 81:14-24, 82:3-14, 83:10-17.)

During the deposition, plaintiff's counsel provided Dr. Grammens with the images from the 1999 and 2005 CT scans. (*See id.* at 95:8-24.) Defendants' counsel asked Dr. Grammens if a review of the CT scan images changed his opinion, and Dr. Grammens replied: "From what we've already stated, no." (*Id.* at 96:6-8.) Dr. Grammens made no substantive changes to his deposition testimony when given an opportunity. (*Id.* at 99.)

On May 11, 2009, a day before plaintiff filed her brief in opposition to defendants' motion for summary judgment, Dr. Grammens signed an amended expert affidavit.

_____

(Footnote continued.)

>    A.    Smaller than it was in 2005.
>
>    Q.    You've said that, and what I'm trying to figure out is when you said that I believe it was much smaller what you mean by that?
>
>    A.    I think it would be reasonable to assume that it was probably half of the size, based on the fact that – it's unlikely that the doubling time of this tumor, even based on what we know in 2005 in terms of the grade and some of the other features, that this tumor had not doubled in size, at least.
>
>    Q.    What was the size of the tumor in 2005?
>
>    A.    I believe the final pathology report was about eight centimeters.
>
>    Q.    So you're telling us that you believe it's reasonable to assume that the tumor was about four centimeters in 1999?
>
>    A.    I think that's a reasonable hypothesis.

(Karpenko Decl. Ex. B, Grammens Dep. Tr. 78:15 - 79:13.)

(Ketroser Decl. Ex. 7, Grammens Am. Aff., Docket No. 29.)  In that affidavit, Dr.

Grammens states:  (1) "After reviewing the 1999 CT scan, I estimate that the maximum

AP or lateral dimension of the tumor was 6.4 cm"; and (2)

> Accurate staging to determine whether the renal carcinoma was Stage 1 or
> Stage 2 is not possible because the tumor was not removed and accurately
> measured in 1999.  There is no reliable evidence on the 1999 CT scan that
> the tumor involved the renal sinus or perinephric fat or that there was
> coagulative tumor necrosis at that time.  It is also not possible to reliably
> determine the Fuhrman Grade of the tumor in 1999 using any existing
> medical information.

(*Id.* ¶¶ 10, 20.)

### B.    Defendants' Expert: Dr. Michael Blute

Defendants retained as an expert Dr. Michael Blute, a urologist specializing in

urologic oncology and urologic surgery.  (Blute Decl. ¶ 1, Docket No. 20.)  Dr. Blute

specializes in the diagnosis and surgical management of renal cancer.  (*Id.*)  Dr. Blute

surgically removed the tumor from Tyler's kidney in November 2005.  (Karpenko Decl.

Ex. C at 2, Docket No. 21.)

In his expert opinion, Dr. Blute employed an integrated cancer staging system

developed by Mayo to stage Tyler's cancer in 1999.  (Blute Decl. ¶¶ 3-5, Docket No. 20.)

Dr. Blute opines that the images from the 1999 CT scan and other features of Tyler's

cancer "confirm to a reasonable degree of medical certainty that the mass had a number

of features in 1999: (a) its largest dimension was between 6 and 6.5 centimeters; (b) it

was invading the renal sinus fat; and (c) the mass contained tumor necrosis."  (*Id.* ¶ 5.)

Dr. Blute concludes that "Tyler's kidney mass in 1999 was of significant size and given

what is known about the aggressiveness of the lesion, a radical nephrectomy in 1999 would likely not have prevented progression of renal cancer." (Karpenko Decl. Ex. C at 2, Docket No. 21.) Dr. Blute states that the features of Tyler's cancer in 1999 made "Tyler's cancer-specific survival rate for five years less than fifty percent." (*Id.* at 3.) Dr. Blute notes that Tyler's immunosuppressive treatment for myasthenia gravis would have further reduced the likelihood that Tyler's cancer would have been cured had he received a timely diagnosis. (Blute Decl. ¶ 7, Docket No. 20.) Dr. Blute also challenges the scientific reliability of Dr. Grammens' expert opinion, asserting that the TNM staging system is obsolete in light of newer integrated staging systems such as those he employed as the basis for his own expert opinion. (*Id.* ¶ 3.)

## DISCUSSION

## I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The parties do not contest at summary judgment the applicable standard of care or that defendants departed from that standard in failing to diagnose Tyler with renal cell carcinoma in September 1999. Here, the Court need only resolve whether plaintiff has brought forth adequate expert evidence establishing causation for her medical malpractice claim, whether a genuine fact dispute regarding causation remains, and whether plaintiff's cause of action accrued outside of the statute of limitations. The Court addresses the first two questions together, and then turns to the question of whether the statute of limitations bars this action.

## II.    CAUSATION

"To establish a prima facie case of medical malpractice, a plaintiff must introduce expert testimony demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant, (2) that the defendant departed from that standard, and (3) that the defendant's departure was a direct cause of the plaintiff's injuries." *Fabio v. Bellomo*, 504 N.W.2d 758, 762 (Minn. 1993). To establish the third element, "a plaintiff must present competent expert testimony showing that the defendant's action or inaction was a direct cause of the injury." *McDonough v. Allina Health Sys.*, 685 N.W.2d 688, 697 (Minn. Ct. App. 2004); *see Fabio*, 504 N.W.2d at 762. If plaintiff fails to provide admissible expert testimony on causation, plaintiff fails to establish an essential element of her case and defendants are entitled to summary judgment. *McDonough*, 685 N.W.2d at 697.

## A.     Defendants' Motion for Summary Judgment

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.   Under Rule 702, expert testimony must satisfy three prerequisites to be admitted.  *See Lauzon v. Senco Prods. Inc.*, 270 F.3d 681, 686 (8th Cir. 2001); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).  "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy." *Lauzon*, 270 F.3d at 686 (citation omitted).  Second, the expert witness must be qualified.  *Id.* "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires[.]"   *Id.* (internal quotation marks omitted).   The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597-98 (1993).

The third prerequisite – that proposed expert testimony be reliable or trustworthy – requires that (1) the testimony be "based upon sufficient facts or data"; (2) the testimony be "the product of reliable principles and methods"; and (3) the witness "appl[y] the principles and methods reliably to the facts of the case." *Lauzon*, 270 F.3d at 686 (internal quotation marks omitted).  "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

Defendants argue that Dr. Grammens' opinion is inadmissible because it is based on unreliable methodology, and because it is based on speculative facts or facts that are contrary to the actual facts of the case. As referenced above, in conjunction with her brief in opposition to defendants' motion for summary judgment, plaintiff submitted an amended expert affidavit by Dr. Grammens that appears to address the flaws raised by defendants. Defendants ask the Court to strike the amended affidavit because it directly contradicts Dr. Grammens' sworn deposition testimony.

### 1. Dr. Grammens' Opinion Is the Product of Reliable Principles and Methodology.

In evaluating whether Dr. Grammens' opinion is the product of reliable principles and methods under the third prerequisite, the Court considers (1) whether the technique or method can be and has been tested; (2) whether the technique or method "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the technique or method has general acceptance in the scientific community. *See Daubert*, 509 U.S. at 593-94. The Court focuses "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Defendants argue that Dr. Grammens' opinion is inadmissible because the TNM cancer staging method is obsolete. Defendants' expert Dr. Blute asserts that urologists who specialize in the study, diagnosis, and surgical treatment of renal cell carcinoma no longer use the TNM system, and instead employ new, integrated cancer staging systems like those developed by Mayo. (Blute Decl. ¶ 3, Docket No. 20.) The integrated staging

systems account for additional factors, including tumor grade and tumor necrosis, that are statistically significant for the purposes of assessing the likelihood of a cancer patient's survival. (*Id.*) Dr. Blute also states that peer-reviewed medical literature suggests that the TNM system is not scientifically reliable. (*See id.* ¶ 4.) For example, a 2007 article by a physician at the Cleveland Clinic states:

> Traditionally, the TNM staging system has been utilized for predicting patient outcome. . . . [M]ultiple centers have recently evaluated prognostic factors in addition to the TNM staging system to construct clinical algorithms with improved predictive ability. . . .
>
> Three major prognostic algorithms for [renal cell carcinoma] have been proposed recently, each with prognostic ability greater than the TNM staging system alone. These include the Mayo Clinic SSIGN score, the Memorial Sloan-Kettering Cancer Center (Kattan) nomogram, and the UCLA Integrated Staging System (UISS).

(Blute Decl. Ex. A, Andrew C. Novick, M.D., *Kidney Cancer: Past, Present, and Future*, Urologic Oncology: Seminars and Original Investigations 188, 188-89 (2007), Docket No. 20.)

According to defendants, Dr. Grammens' opinion that the TNM system is scientifically reliable is not persuasive because Dr. Grammens is not a member of the "relevant medical community": only one to two percent of his active charts in his oncology practice are kidney cancer patients and his oncology practice comprises only two-thirds of his total practice. (*See* Karpenko Decl. Ex. B, Grammens Dep. Tr. at 15:3-6, 22:4-24, Docket No. 21.)

In response, plaintiff cites Dr. Grammens' amended expert affidavit, which states that Dr. Grammens is qualified to determine whether a kidney cancer patient would

benefit from a nephrectomy.  (Ketroser Decl. Ex. 7, Grammens Am. Aff. ¶ 4, Docket No. 29.)  Plaintiff also submits evidence that the American Joint Committee on Cancer and Mayo, itself, note in materials that are created for the public that physicians use the TNM system to stage cancer.  (*See* Ketroser Decl. Exs. 8-9, Docket No. 29.)

In these circumstances, Dr. Grammens' use of TNM staging to stage Tyler's cancer in 1999 does not render his expert opinion inadmissible.  As an initial matter, although Dr. Grammens' kidney cancer practice constitutes a relatively small proportion of his overall medical practice, that fact alone does not exclude Dr. Grammens from the relevant medical community.  Further, while there appears to be some development in the methods for kidney cancer staging, the Court is not persuaded that the TNM staging system is no longer scientifically reliable.  The peer-reviewed medical literature that defendants cite indicates that integrated staging systems may have greater prognostic ability than the TNM system, but that literature does not definitively conclude that the TNM staging system is no longer accepted by the relevant medical community.

"The inquiry as to the reliability and relevance of the testimony is a flexible one designed to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Marmo*, 457 F.3d at 757 (quoting *Kumho Tire Co.*, 526 U.S. at 152).  Given the record before the Court, Dr. Grammens' application of the TNM staging system to reach his conclusions on the issue of causation is appropriate, and accordingly his opinion is admissible to that extent.

*Cf. Marmo*, 457 F.3d at 758 ("Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility.").

### 2.  Dr. Grammens' Opinion Is Not Speculative or Contrary to the Actual Facts.

Defendants argue that Dr. Grammens' expert opinion is speculative because he testified that "it was impossible" for him to stage the cancer in 1999 because he lacked information about the size, location, and grade of the tumor; he did not have information about whether there was tumor necrosis; and he did not have information about whether the tumor had invaded the renal sinus fat. (*See* Karpenko Decl. Ex. B, Grammens Dep. Tr. at 42:23 - 43:9; 81:14 - 82:6; 92:15 - 95:7, Docket No. 21.) Defendants also argue that Dr. Grammens' opinion is based on factual assumptions that are contrary to the "actual facts" in the case. Dr Grammens testified that he "assumed" that the tumor was four centimeters in 1999, and that the tumor had not invaded the renal sinus fat or developed tumor necrosis. (*See id.* at 78:12 - 83:5; 94:18-21.) Defendants argue that those assumptions are contradictory to the findings of Dr. Blute, who issued an expert report after reviewing the 1999 CT scan images. Dr. Blute concluded that Tyler's tumor in 1999 measured between 6 and 6.5 centimeters, was invading the renal sinus fat, and contained significant tumor necrosis. (Karpenko Decl. Ex. D, Blute Dep. Tr. at 7:1 - 9:3, 13:9 - 14:25; Blute Decl. ¶ 5, Docket No. 20.)

Plaintiff responds by citing Dr. Grammens' original and amended expert affidavits and arguing that Dr. Grammens did not concede that he did not have adequate

information about the size and location of the tumor to determine causation. Plaintiff notes that Dr. Grammens staged the cancer in 1999 at Stage I or Stage II and that the only difference between the two stages in renal cell carcinoma is that Stage I tumors are less than or equal to 7 centimeters and Stage II tumors are greater than 7 centimeters. (Ketroser Decl. Ex. 2, Docket No. 29.) Further, plaintiff argues that Dr. Grammens did not definitively opine on the size of the tumor in 1999 and, regardless, that he opined that the appropriate treatment for tumors between 4 centimeters and 8.5 centimeters is a nephrectomy, and that such a procedure would probably have cured Tyler's cancer. Finally, plaintiff argues that Dr. Grammens did not speculate as to the location of the tumor: in the original expert affidavit, Dr. Grammens stated that "there is no evidence that the tumor extended beyond the kidney or had metastasized." (*Id.* Ex. 1 ¶ 17.) In the amended expert affidavit, Dr. Grammens states "there is no reliable evidence that the tumor involved the renal sinus or perinephric fat in 1999." (*Id.* Ex. 7 ¶ 14.)

### a.    Dr. Grammens' Amended Expert Affidavit

Defendants ask the Court to strike Dr. Grammens' amended expert affidavit because it contradicts his sworn deposition testimony. Generally, a party may not create a genuine issue of material fact in opposition to a motion for summary judgment by submitting an affidavit that contradicts sworn deposition testimony. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364-66 (8th Cir. 1983). That is particularly true when a party submits the affidavit on the same day that its opposition to summary judgment is due, as it "indicate[s] that the [party] engaged in a last-minute effort to create

a genuine issue of material fact" to defeat summary judgment. *City of St. Joseph v. Sw. Bell Tel.*, 439 F.3d 468, 476 (8th Cir. 2006).

Defendants claim that the amended expert affidavit contradicts Dr. Grammens' sworn deposition testimony in three key respects. First, defendants argue that although Dr. Grammens asserted that it would be "impossible" for him to stage Tyler's cancer in 1999, he now states that he can stage the cancer at Stage I or Stage II, and the only impossibility is assessing which of those two stages it was. (*See* Ketroser Decl. Ex. 7, Grammens Am. Aff. ¶ 20, Docket No. 29.) Second, defendants argue that Dr. Grammens now states that there was no reliable evidence on the 1999 CT scan that the tumor had invaded renal sinus or perinephric fat or that there was tumor necrosis, although Dr. Grammens earlier testified that he did not have enough information to make those conclusions. Third, defendants point out that Dr. Grammens testified at his deposition that he could not determine the exact size of the tumor in 1999 (although he assumed it would be roughly half of what it was in 2005[3]), but he now contends that the tumor was approximately 6.4 cm in 1999. (*Id.* ¶ 10.)

The Court concludes that Dr. Grammens' amended expert affidavit does not contradict his deposition testimony. After receiving the CT scan images during his deposition, Dr. Grammens stated that the CT images did not change his expert **opinion**, which in short concludes that if Tyler had undergone a nephrectomy between September 1999 and March 2004, his cancer probably would have been cured. Dr. Grammens

---

[3] *See* n.2, *supra.*

testified that it was "impossible" to stage Tyler's cancer in 1999, and the amended affidavit is reconcilable with that testimony and Dr. Grammens' opinion in the original affidavit that Dr. Grammens could not conclude with medical certainty whether Tyler's cancer was Stage I or Stage II.  And while it is true that Dr. Grammens testified that he did not have enough information to opine whether the cancer had invaded the renal or perinephric fat, the amended affidavit accounts for Dr. Grammens' review of the 1999 CT scan images.  Finally, Dr. Grammens merely hypothesized in his deposition testimony that Tyler's tumor was roughly half the size of the 2005 tumor.  Dr. Grammens' amended affidavit is based on his review of the 1999 CT scan images.  Because Dr. Grammens offered an approximation in his deposition testimony, the Court does not find that the amended affidavit contradicts that testimony such that the Court should strike the affidavit.

The Court notes some concern with the timing of the submission of the amended affidavit, but Dr. Grammens' amended affidavit does not "raise a new matter, but rather . . . explain[s] certain aspects of his deposition testimony."  *Camfield*, 719 F.2d at 1364 (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980)).  In sum, the amended affidavit "is not inherently inconsistent" with Dr. Grammens' earlier testimony, the amended affidavit does not suggest that the issue of fact here is a "sham," *see Camfield*, 719 F.2d at 1364-65, and the Court accordingly declines to strike the amended affidavit.  *See Bone*, 622 F.2d at 894-95 ("[T]he statement in the affidavit is not at odds with [the defendants'] general theory of defense presented in the deposition.").

### b.    Speculative or Contrary to Actual Facts

The Court concludes that Dr. Grammens' opinion is not speculative or contrary to the actual facts of the case, but merely reflects a difference of opinion with Dr. Blute. Defendants cite Dr. Blute's opinion to establish the "actual facts" of the case, but the Court declines to characterize Dr. Blute's assertions as such.  Indeed, Dr. Blute's statements are opinions about the characteristics of Tyler's cancer in 1999, and that opinion is subject to contrary opinions such as those offered by Dr. Grammens.

In sum, Dr. Grammens' opinion on causation is admissible and, therefore, viewing the evidence in a light most favorable to plaintiff, there is adequate expert evidence from which a rational trier of fact could find in plaintiff's favor on the issue of causation. Summary judgment for defendants is not warranted.

### B.    Plaintiff's Motion for Summary Judgment

Plaintiff moves for partial summary judgment on defendants' negligence, claiming that defendants have admitted that Dr. Harper breached a standard of care by failing to notice the mass in Tyler's left kidney as shown in the 1999 CT scan and that "no party has disputed his admission of negligence."  (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at 2, Docket No. 26.)  Plaintiff concedes, however, that "[t]he direct cause of Plaintiff's compensable injury is hotly disputed between the parties."  (Reply Mem. at 1, Docket No. 35.)  The Court agrees, as discussed in detail above.  Dr. Blute's opinion is more than adequate to create a genuine fact dispute on the issue of causation, and

accordingly, the Court denies plaintiff's motion for summary judgment on defendants' negligence.

## III.    STATUTE OF LIMITATIONS

In Minnesota, "[a]n action . . . against a health care provider alleging malpractice, error, mistake, or failure to cure . . . must be commenced within four years from the date the cause of action accrued."  Minn. Stat. § 541.076(b); *see also id.* § 573.02, subd. 1 (allowing a trustee to maintain a wrongful death action on behalf of the next of kin provided that the § 541.076 timing requirements are satisfied).  Although the Minnesota statute does not state when a cause of action accrues, the Minnesota Supreme Court in *MacRae v. Group Health Plan, Inc.*, 753 N.W.2d 711 (Minn. 2008), discussed when a cause of action for failure to diagnose cancer accrues.

Generally, "a cause of action accrues at such time as it could be brought in a court of law without dismissal for failure to state a claim."  *Id.* at 716-17 (internal quotation marks omitted).  That is, "the limitations period begins to run when the plaintiff can allege each of the essential elements of a claim."  *Id.* at 717.  Because the statute of limitations is an affirmative defense, defendants have the burden of establishing that the statute of limitations bars this action.  *Id.* at 716.

In cases where a health care provider allegedly fails to diagnose cancer, a cause of action accrues when some injury or "compensable damage" from the negligent act actually occurs.  *Id.* at 719-20.  The Court "look[s] at the **unique circumstances of the particular case** to determine when some compensable damage occurred as a result of the

alleged negligent misdiagnosis." *Id.* at 721-22 (emphasis added). Compensable damage does not necessarily occur as a matter of law at the time of the misdiagnosis. *Id.* at 721. Rather, "a patient suffers compensable damage from a negligent misdiagnosis of cancer when it becomes more likely than not that he will not survive the disease" or when the natural progression of the undiagnosed disease has other consequences that constitute compensable damage. *Id.* at 722-23. "Although the continued presence of a patient's cancer alone might not be compensable damage, the progression of the disease may require the patient to undergo a different course of treatment or to incur additional medical expenses." *Id.* at 722. "Moreover, the continued presence of the cancer may cause the patient to suffer pain, loss of bodily functions, or some other damage." *Id.* Where the record reflects evidence of those circumstances or "undoubtedly other scenarios," there could be compensable damage such that a cause of action for a health care provider's failure to diagnose cancer accrues. *Id.*

Plaintiff filed the complaint against defendants on March 4, 2008. Accordingly, if her cause of action accrued prior to March 4, 2004, the statute of limitations bars this action. Defendants submit evidence that plaintiff's cause of action accrued sometime between September 1999 and March 2004. Dr. Blute testified that the large volume of cancer and the dissemination of cancer cells into Tyler's body demonstrated that Tyler's kidney cancer was particularly aggressive. (Karpenko Decl. Ex. D, Blute Dep. Tr. at 29:6-7, 31:17-23, 35:25-36:3, Docket No. 21; *see also* Blute Decl. ¶¶ 5-6, Docket No. 20.) Dr. Blute also noted that Tyler's immunosuppressant therapy for myasthenia

gravis compromised Tyler's likelihood of survival. (Blute Decl. ¶ 7, Docket No. 20.)

According to Dr. Blute, because a nephrectomy was not performed in 1999, Tyler's

"cancer grew and disseminated more and more cancer cells into Mr. Tyler's body

between 1999 and March of 2004. This natural progression of growth and dissemination

of cancer cells made the kidney cancer incrementally more dangerous to Mr. Tyler

because it made the cancer more difficult to successfully treat and more likely to result in

his death." (*Id.* ¶ 6.) As a result of those factors, Dr. Blute opines,

> Mr. Tyler's kidney cancer posed a greater and greater danger to Mr. Tyler
> with the passage of each day between 1999 and March 2004. The cancer
> cells disseminated by his kidney cancer made more and more deposits
> throughout his body. Although these deposits may not have been clinically
> detectable, they posed a greater and greater danger to Mr. Tyler that he
> would develop metastatic cancer, a greater and greater danger that a
> subsequent nephrectomy would not remove all of the cancer deposits, and a
> greater and greater danger that Mr. Tyler would develop fatal metastases
> after an otherwise successful nephrectomy.

(*Id.* ¶ 7.)

The Court concludes that there is a dispute of fact regarding when plaintiff's cause

of action accrued and neither party is entitled to summary judgment on the issue.

Dr. Blute's opinion fails to pinpoint when the cause of action accrued. Although

defendants adduce evidence regarding the growth of Tyler's tumor and the dissemination

of cancer cells into Tyler's body, the assertion that the cancer posed a "greater and

greater danger" to Tyler with each passing day between September 1999 and March 2004

is inadequate to satisfy defendants' burden. "[T]he continued presence of cancer

following a negligent misdiagnosis, by itself, may not be compensable damage."

*MacRae*, 753 N.W.2d at 720.  Dr. Blute's opinion does not undisputedly establish that the cause of action accrued before March 2004, as he attests only to the continued presence of Tyler's cancer without effectively describing when the natural progression of the disease constituted compensable damage. *Cf. Leubner v. Sterner*, 493 N.W.2d 119, 121 (Minn. 1992) ("[P]laintiffs contend that the claimed injury is 'the enlarged, unchecked tumor.'  But the tumor was removed in February 1988, just as it would have been removed 7 months earlier.  It is unclear what the damages would be for removal of a larger rather than a smaller tumor.").

Indeed, Dr. Harper's November 4, 2005, notes indicate that a July 18, 2005, chest x-ray had been normal, whereas the November 2005 chest x-ray revealed masses in Tyler's lungs.  (Ketroser Decl. Ex. 1, Docket No. 27; *see also* Ketroser Decl. Ex. 1, Grammens Aff. ¶ 11, Docket No. 29.)  Thus, the record indicates that the cancer may not have metastasized until sometime between July 2005 and November 2005 – within the limitations period.  Although the Court does not conclude here that clinical evidence of metastatic disease is required to establish compensable damage, the development of masses in Tyler's lungs during that time period at least creates a fact issue as to when Tyler suffered compensable damages.

Dr. Blute's opinion creates a fact issue as to accrual, as it describes the growth of Tyler's tumor during the relevant time period and, consequently, opines that metastatic disease became more likely as Tyler's disease progressed.  Given the record before the Court, a fact issue remains regarding whether Tyler suffered some compensable damage

before March 2004, and accordingly the Court denies both parties' motions on the statute of limitations issue.

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Summary Judgment [Docket No. 16] is **DENIED**.

2.      Plaintiff's Motion for Partial Summary Judgment for Negligence [Docket No. 24] is **DENIED**.


DATED:  March 31, 2010                 s/ John R. Tunheim
at Minneapolis, Minnesota.            JOHN R. TUNHEIM
                                  United States District Judge